No. 23-6138

**In The United States Court Of Appeals For The Tenth Circuit**

_____

NICHOLAS SELLMAN
PLAINTIFF/APPELLANT,

*v.*

AVIATION TRAINING CONSULTING, LLC
DEFENDANT/APPELLEE.

_____

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE

Case No. CIV-22-365-D

APPELLEE'S BRIEF

Philip R. Bruce
McAfee & Taft A Professional Corporation
Eighth Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone (405) 552-2390
**Attorney for Appellee**

**Oral Argument Not Requested**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    STATEMENT OF ISSUES PRESENTED FOR REVIEW............................1

II.   STATEMENT OF THE CASE AND FACTS ................................................2

    1.    Procedural History...................................................................................2

    2.    ATC's and Sellman's Background..........................................................2

    3.    Sellman's Complaint, Investigation, and the Result. ............................4

    4.    Sellman's Marginal Performance...........................................................5

    5.    Sellman's Failure to Maintain his FAA Certification. .........................8

    6.    The Decision to Not Renew Sellman's Contract. ...............................12

III.  SUMMARY OF THE ARGUMENT .........................................................14

IV.   STANDARD OF REVIEW ......................................................................18

V.    ARGUMENTS AND AUTHORITIES .......................................................20

    1.    Plaintiff's ADA Discrimination and Retaliation Claims Fail.............20

        A.    Sellman Cannot Show a Causal Connection Between His Alleged Protected Activity in November 2017 and the Decision to Not Renew His Contract in March 2018..............22

        B.    Sellman Cannot Show a Causal Connection Because He has Nothing More than Speculation that Mueller Knew of the November Incident or His HR Complaint. ........................24

    2.    Sellman Cannot Show Pretext Based on a Cat's Paw Theory. ..........26

        A.    Sellman Has Nothing but Speculation that Mueller Knew of Sellman's Protected Conduct and Mere Knowledge is Insufficient to Establish Pretext. ...............................................28

B.  Cox, Stephens, and Young Did Not Act as a "Rubber Stamp" of Any Recommendation. .............................................30

C.  Sellman's Performance Appraisal Does Not Establish any Pretext or a Cat's Paw Theory. .........................................31

3.  Sellman Cannot Establish a Discrimination Claim for The Independent Reasons That He Is Not Disabled and There Is No Evidence of Disability Discrimination Pretext. .................................37

A.  ATC is DAV Owned, All Decisionmakers and Mueller were DAVS, and Sofge's Alleged Comments were Stray Remarks. .................................................................................37

B.  Sellman Did Not Provided Sufficient Evidence That He Is Disabled Under the ADA. .....................................................39

4.  USEERA Does not Include Claims of Discrimination or Retaliation Based on a VA Disability Rating and There is No Evidence that Sellman's Status as a Veteran had Any Role in his Non-renewal. .................................................................................43

A.  Sellman Did Not make a USERRA Claim as a Matter of Law Based on the Plain Language, Statutory Structure, and Weight of Authority. .........................................................44

B.  Even if Sellman Properly Made a USERRA Claim, There Is No Evidence that His Military Service was a Motivating Factor in his Non-renewal....................................47

VI.  REQUEST FOR RELIEF ..............................................................48

VII.  STATEMENT REGARDING ORAL ARGUMENT ...................................48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cty., Okla.*,
    232 F. App'x 765 (10th Cir. 2007)........................................................... 41

*Almon v. Goodyear Tire & Rubber Co.*,
    No. 07-4104-SAC, 2009 WL 1421199 (D. Kan. May 20,
    2009) ...................................................................................................... 38

*Alsbrook v. Int'l Paper Co.*,
    No. 2:19-CV-673-TFM-MU, 2021 WL 4482143 (S.D. Ala.
    Sept. 29, 2021) ...................................................................................... 41

*Anderson v. AOL, LLC*,
    363 F. App'x 581 (10th Cir. 2010)........................................................... 29

*Anderson v. Coors Brewing Co.*,
    181 F.3d 1171 (10th Cir. 1999) ................................................... 20, 21, 23

*Angell-Boyd v. Universal Cable Holdings, Inc.*,
    No. CIV-07-0724-HE, 2008 WL 11337968 (W.D. Okla.
    Oct. 1, 2008) .......................................................................................... 38

*Aramburu v. Boeing Co.*,
    112 F.3d 1398 (10th Cir. 1997) ............................................................... 33

*Armstrong v. The Arcanum Grp., Inc.*,
    897 F.3d 1283 (10th Cir. 2018) .............................................................. 24

*Boswell v. Skywest Airlines, Inc.*,
    361 F.3d 1263 (10th Cir. 2004) .............................................................. 45

*Carroll v. Delaware River Port Auth.*,
    89 F. Supp. 3d 628 (D.N.J. 2015)........................................................... 46

*Cazares v. City of El Centro*,
    No. 320CV01571BENRBM, 2021 WL 807680 (S.D. Cal.
    Mar. 3, 2021)......................................................................................... 45

iv

*Christopher v. Adam's Mark Hotels*,
    137 F.3d 1069 (8th Cir. 1998) ................................................... 29

*Clark v. Champion Nat'l Sec., Inc.*,
    952 F.3d 570 (5th Cir. 2020) .................................................... 20

*Davis v. Simon Prop. Grp.*,
    9 F.App'x 876 (10th Cir. 2001) ................................................ 22

*DePaula v. Easter Seals El Mirador*,
    859 F.3d 957 (10th Cir. 2017) .................................................. 28

*Evans v. City of Houston*,
    246 F.3d 344 (5th Cir. 2001) .................................................... 24

*Ferrell v. Ezpawn Oklahoma, Inc.*,
    No. CIV-18-607-SLP, 2019 WL 3207797 (W.D. Okla. July
    16, 2019) ................................................................................ 45

*Gunnell v. Utah Valley State College*,
    152 F.3d 1253 (10th Cir.1998) ................................................. 26

*Hinds v. Sprint/United Mgmt. Co.*,
    523 F.3d 1187 (10th Cir. 2008) ................................................ 35

*Kendrick v. Penske Transp. Servs., Inc.*,
    220 F.3d 1220 (10th Cir. 2000) ................................................ 27

*Kenfield v. Colorado Dep't of Pub. Health & Env't*,
    557 F. App'x 728 (10th Cir. 2014) ........................................... 26

*Laul v. Los Alamos Nat'l Lab'ys*,
    765 F. App'x 434 (10th Cir. 2019) ........................................... 24

*Laul v. Los Alamos Nat'l Lab'ys*,
    No. 1:17-CV-0741-WJ-KBM, 2020 WL 365024 (D.N.M.
    Jan. 22, 2020) ....................................................................... 30

*Lawson v. CSX Transp., Inc.*,
    245 F.3d 916 (7th Cir. 2001) .................................................... 42

*Leistiko v. Sec'y of Army*,
   922 F. Supp. 66 (N.D. Ohio 1996), *aff'd sub nom. Leistiko v.*
   *Stone*, 134 F.3d 817 (6th Cir. 1998) ........................................ 46

*Lincoln v. BNSF Railway Co.*,
   900 F.3d 1166 (10th Cir. 2018) ............................................... 20

*Lobato v. New Mexico Env't Dep't*,
   733 F.3d 1283 (10th Cir. 2013) ............................................... 27

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ................................................................. 46

*McDaniel v. Piedmont Indep. Sch. Dist. No. 22*,
   No. CIV-11-373-M, 2012 WL 1227154 (W.D. Okla. Apr.
   11, 2012) ................................................................................. 27

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ........................................................... 20, 21

*McKenzie-Nevalas v. Deaconess Holdings LLC*,
   No. CIV-12-570-D, 2014 WL 518086 (W.D. Okla. Feb. 7,
   2014), *appeal dismissed* (May 28, 2014) ................................. 21

*McKnight v. Kimberly Clark Corp.*,
   149 F.3d 1125 (10th Cir. 1998) ............................................... 38

*Metz v. Merrill Lynch, Pierce, Fenner & Smith*,
   39 F.3d 1482 (10th Cir. 1994) ................................................. 34

*Metzler v. Fed. Home Loan Bank of Topeka*,
   464 F.3d 1164 (10th Cir.2006) ................................................ 21

*Moore v. Wal-Mart Stores E., L.P.*,
   No. CIV. A. 707CV193 HL, 2009 WL 3109823 (M.D. Ga.
   Sept. 23, 2009) ....................................................................... 42

*Nyanjom v. Hawker Beechcraft Corp.*,
   No. 12-1461-JAR, 2015 WL 3397934 (D. Kan. May 26,
   2015), *aff'd*, 641 F. App'x 795 (10th Cir. 2016) ..................... 20

*Palzer v. Coxcom, LLC*,
   2019 WL 11585348 (N.D.Okla.) .............................................. 29

*Payan v. United Parcel Serv.*,
    792 F. App'x 634 (10th Cir. 2019) ........................................................... 34

*Petersen v. Utah Dep't of Corr.*,
    301 F.3d 1182 (10th Cir. 2002) ................................................................ 24

*Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*,
    No. CIV-15-936-R, 2017 WL 5618613 (W.D. Okla. Nov.
    20, 2017) ................................................................................................ 25

*Richmond v. ONEOK, Inc.*,
    120 F.3d 205 (10th Cir. 1997) ................................................................. 32

*Rowe v. Shulkin*,
    No. 17-CV-9258, 2019 WL 2060951 (N.D. Ill. May 9, 2019) .............. 40

*Russell v. Phillips 66 Co.*,
    687 F. App'x 748 (10th Cir. 2017) ..................................................... 39, 41

*Simmons v. Sykes Enterprises, Inc.*,
    647 F.3d 943 (10th Cir. 2011) ................................................................. 24

*Singh v. Cordle*,
    936 f.3d 1022 (10th Cir. 2019) ..................................................... 22, 27, 30

*Smith v. Wilkie*,
    No. 3:17-CV-1333-J-JRK, 2019 WL 4737604 (M.D. Fla.
    Sept. 27, 2019) ....................................................................................... 40

*Spencer v. U.S. Postal Serv.*,
    No. 08-CV-02249-KLM-MEH, 2009 WL 5217981 (D.
    Colo. Dec. 29, 2009), aff'd, 388 F. App'x 785 (10th Cir.
    2010) ...................................................................................................... 40

*Tesone v. Empire Mktg. Strategies*,
    844 F. App'x 64 (10th Cir. 2021) ............................................................ 41

*Thompson v. Little am. Hotel Co.*,
    No. 22-4006, 2022 WL 10832885 (10th Cir. Oct. 19, 2022) ................. 27

*Toyota Motor Mfg., Ky., Inc. v. Williams*,
    534 U.S. 184, *superseded by statute on other grounds* ........................... 42

*Vasilescu v. Black & Veatch Pritchard, Inc.*,
   155 F. Supp. 2d 1285 (D. Kan. 2001)........................................................ 38

*Ward v. Jewell*,
   772 F.3d 1199 (10th Cir. 2014) ............................................................. 25

*Wolfgram v. G4S Secure Sols. (USA), Inc.*,
   No. 1:18CV198, 2018 WL 5016337 (N.D. Ind. Oct. 15,
   2018) ....................................................................................................... 45

*Wright v. City of Topeka, Kan.*,
   547 F. App'x 861 (10th Cir. 2013)........................................................... 32

*Young v. Cobe Lab'ys, Inc.*,
   141 F.3d 1187 (10th Cir. 1998) .............................................................. 35

*Young v. Dillon Companies, Inc.*,
   468 F.3d 1243 (10th Cir. 2006) .............................................................. 35

**Statutes**

38 U.S.C. §§ 4301 *et seq.*................................................................................ 46

38 U.S.C. § 4303(13) ..................................................................................... 44

38 U.S.C. § 4311(a) ....................................................................................... 44

38 U.S.C. § 4313(3) ....................................................................................... 44

42 U.S.C. § 12102(1) ..................................................................................... 39

**Other Authorities**

29 C.F.R. § 1630.2 (j)(1)(ii).......................................................................... 39

Fed. R. App. P. 34(a)(1)................................................................................ 48

**Statement of Related Cases**
(Tenth Circuit Rule 28.2(C)(1))

There are no prior or related appeals.

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Robert Cox, Founder & CEO[1] | Cox |
| Dennis Stephens, Vice President of International Operations | Stephens |
| Mike Young, Vice President of Operations | Young |
| Rick Sofge, Director of Operations, Kuwait | Sofge |
| Graham Mueller, Chief Pilot, Kuwait | Mueller |
| James Williams, Director of Human Resources | Williams |
| Jean Colley, Loadmaster Instructor, Kuwait | Colley |
| Disabled American Veteran | DAV |
| United State Department of Veterans Affairs | VA |
| Federal Aviation Administration | FAA |
| Kuwait Air Force | KAF |
| Americans with Disabilities Act | ADA |
| Uniform Services Employment and Reemployment Rights Act | USERRA |
| Appellant's Appendix | App. |
| Appellee's Supplemental Appendix | Supp. App. |
| Undisputed Material Fact | UMF |

---

[1] For ease of reference, ATC lists the titles of relevant individuals at the time of Sellman's employment.

## APPELLEE'S BRIEF

## I.   STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court properly granted summary judgment on Plaintiff Nicholas Sellman's ("Sellman") discrimination and retaliation claims when (A) Sellman admitted all of Aviation Training Consulting's ("ATC"s) material facts, including the decisionmakers' reasons for not renewing his contract, (B) there is no record evidence that the decisionmakers considered Sofge's recommendation when Sofge admittedly had no authority to make the decision to not renew Sellman's contract, and (C) the decision not to renew Sellman's contract was made more than three months after he made a complaint to human resources.

2.      Whether summary judgment on Plaintiff's disability discrimination claim is proper as an independent and alternative basis because the admitted facts show his alleged disabilities did not substantially limit any major life activities, establishing as a matter of law that he is not a qualified individual with a disability under the ADA.

3.      Whether the District Court properly held, along with the majority of other courts considering the same issue, that USERRA does not apply to claims alleging discrimination or retaliation premised upon an employee's disability or VA disability rating.

1

4.      Even if USSERA were to apply to Sellman's claims, whether there is any evidence of discrimination or retaliation based on Sellman's status as a veteran when Sellman's employer knew he was a veteran, strongly preferred or required military experience for Sellman's job, all the decisionmakers were DAVs, and ATC is an award-winning company for hiring DAVs.

## II.    <u>STATEMENT OF THE CASE AND FACTS</u>

### 1.    **Procedural History.**

The District Court granted ATC's motion for summary judgment on all of Sellman's claims, specifically including alleged discrimination and retaliation under the ADA and USERRA. Crucial to the District Court's decision was that Sellman did not dispute, distinguish, or in any way oppose any of ATC's Undisputed Material Facts ("UMF") (App. 15, 26; Supp. App. Vol. II 8). Moreover, Sellman never deposed the three individuals that made the decision to not renew his one-year contract. Sellman has no facts or ability to provide any evidence of what they considered in their decision. All he has is irrelevant facts or rank speculation, none of which are sufficient to reverse the District Court.

### 2.    **ATC's and Sellman's Background.**

ATC is headquartered in Altus, Oklahoma, and its primary corporate office is in Edmond, Oklahoma, a suburb near Oklahoma City. ATC provides various aircraft training services to the armed forces (Supp. Appx. Vol. I 23, 147-51; UMF

3).[2]  Its founder and CEO, Robert Cox ("Cox"), served in the Air Force and is a DAV (*see* Supp. App. Vol I. 153-154; UMF 6, 14). ATC's operations relevant to this case were in Kuwait near the Abdullah Al-Mubarak Air Base.  ATC has a Department of Defense contract to train the Kuwait Air Force ("KAF") in the operations of the KC-130J, a large four-engine cargo plane operated by militaries across the globe. ATC provides classroom instruction to KAF personnel and provides instruction by flying with them on training or other missions (Supp. App. Vol. I 140-44, 147-51; UMF 1-3). By nature of its Kuwait operations, all flight crew employees have related military experience. Indeed, ATC seeks highly qualified veterans because of its high expectations and demanding client requirements for ATC flight crew and told Sellman of its high expectations when he was hired (Supp. App. Vol. I 63-64, 80, 140-44, 147-51, 154, 158, 162; UMF 3, 5).

ATC hired Sellman as a Loadmaster Instructor under a one-year contract that contained no guarantee of a second year (Supp. App. Vol. I 63, 140-42; MF 1). He started working in Kuwait on approximately April 3, 2017, and his one-year term of employment ended April 9, 2018 (Supp. App. Vol I. 143-46; UMF 2). Initially, Rick Sofge ("Sofge") was Sellman's immediate supervisor and the Chief Pilot. Mike Young ("Young") was the Director of Operations in Kuwait. In

---

[2] For convenience, ATC's record citations throughout are to the appendices and the specific UMFs in its motion for summary judgment because Sellman admitted those facts.

September 2017, Sofge was promoted to the Director of Operations and Young returned to Oklahoma as the Vice President of Corporate Operations. Graham Mueller ("Mueller"), then became the Chief Pilot and Sellman's immediate supervisor (*See* Supp. App. Vol I. 19; UMF 15).

### 3.   Sellman's Complaint, Investigation, and the Result.

On or around November 16, 2017, Sellman called James Williams ("Williams"), ATC's HR director in Oklahoma, to report an incident regarding a conversation between Plaintiff and Sofge (the "November Incident") (Supp. App. Vol. I 167-68; UMF 7). While there is some dispute about the specific content of the conversation, the complaint generally involved Sellman alleging that Sofge had made inappropriate comments solely relating to Sellman's 100% VA disability rating (Supp. App. Vol. I 169, 171-81, 190, 232; UMF 8).

Williams investigated the incident by interviewing individuals, determined Sofge had made comments to Plaintiff regarding his VA disability rating, and Dennis Stephens ("Stephens"), ATC's Vice President of International Operations in Oklahoma, then counseled Sofge that the comments were inappropriate (*Id.*).

On December 14, 2017, Williams emailed Sellman the results of his investigation, noting that he documented the situation and it was discussed with Sofge, that ATC is a DAV owned company, and that Sellman should notify Williams if Sofge makes any more comments (Supp. App. Vol. I 195-96; UMF 9).

Sellman admits that after the November Incident, Sofge never made any comments about Sellman's specific alleged disability or veteran status (Supp. App. Vol. I. 119-20, 232; UMF 10). Moreover, Sellman never spoke with Sofge about the November Incident or his HR Complaint (Supp. App. Vol. I 72; UMF 11).

### 4.    Sellman's Marginal Performance.

ATC did not do performance evaluations in Kuwait while Sofge was the Chief Pilot and Young was the Director of Operations (Supp. App. Vol. I 129, 134, 163-64, 194; UMF 15). Sofge decided to start the process of doing some performance evaluations when he became the Director of Operations. *Id.*

As part of that new process, Mueller counseled Sellman on January 9, 2018 and reviewed the "Appraisal Support" form with Sellman (Supp. App. Vol. I 125; 200-01; UMF 16). Mueller then filled out a Performance Appraisal form for Sellman, dated January 31, 2018 (the "Performance Appraisal") (Supp. App. Vol. I 202-03; UMF 17). Mueller recorded no problems with Sellman's technical competency. However, on the Performance Appraisal Mueller gave Sellman a "marginal" ranking or negative comment for dependability, communication skills, and initiative (*Id.*; UMF 18).

Mueller's criticism of Sellman's mediocre performance, however, did not end with the Performance Appraisal. On February 5, 2018, Mueller emailed Sofge the appraisal support form and Performance Appraisal. Mueller provided

5

additional comments, including his ranking that, "From my relative value rankings he is ranked 3/3 for loadmaster instructors and his overall average falls at the bottom of the aircrew stack." Mueller also again highlighted Sellman's marginal performance for dependability, communication skills, and initiative (Supp. App. Vol. I 204-05; UMF 19). Sofge forwarded the Performance Appraisal and Mueller's additional comments to Williams and Stephens on Feb. 6, 2018 (*Id.*). More still, neither Mueller nor Sofge ever told Sellman he was doing a good job (Supp. App. Vol. I 130; UMF 21). Indeed, Mueller stood by his negative performance evaluation of Sellman (Supp. App. Vol. II 144-145).

Mueller was not the only one that had personally observed Plaintiff's substandard performance. While Young was in Kuwait as the Director of Operations, he observed that Sellman's performance was below that of the other Loadmasters. Before he left Kuwait, Young met with Sellman and told him he needed to "tighten it up" with his performance (Supp. App. Vol. I 163; UMF 24).

Crucially, Sellman has no personal knowledge of what Mueller knew about the November Incident, never told Mueller about the November Incident, and Sellman never told anybody about his complaint to HR (Supp. App. Vol. I 126-28; UMF 12). Sellman's own notes of the November Incident show Mueller was not present (Supp. App. Vol. I 232). Mueller testified (1) he was not there when the November Incident happened, (2) he has no first-hand knowledge of the argument,

6

(3) he did not have any knowledge of what happened when he wrote his performance evaluation of Sellman, and (4) he never discussed it with Sofge (Supp. App. Vol. II 149-51). Importantly, Mueller also had no knowledge of Sellman's complaint to HR until after Mueller's own employment ended (Supp. App. Vol II. 145-147). Moreover, Sofge, Cox, Stephens, Young, and Williams never told Mueller about the November Incident or Sellman's complaint to HR, and Sellman even admitted he had no reason to believe Mueller knew of Sellman's complaint to HR (Supp. App. Vol. I 154-55, 159, 163; 198; UMF 13).  Indeed, Sellman admitted that there is no retaliation if Mueller did not know of the November Incident or Sellman's complaint to HR (Supp. App. Vol. I 75).

Sellman argues that ATC failed to follow its performance evaluation policy. But there is no evidence of this and the decisionmakers had no knowledge of any established policy in place. Specifically, Cox, Stephens, and Young did not have any knowledge of the specific process of Sellman's Performance Appraisal or what process Sofge intended to follow with performance evaluations (Supp. App. Vol. I 155, 159, 163-64; UMF 23). Moreover, there is no evidence regarding how Mueller applied the policy in how he did performance evaluations to any other employees, as Sellman was the only employee Mueller reviewed. Because of the timing of the other employees' contracts and Mueller's own contract not being

renewed, Sofge did the performance appraisals or appraisal support forms for the other Loadmasters in 2018 (Supp. App. Vol. I 184; UMF 22).

**5.    Sellman's Failure to Maintain his FAA Certification.**

As a condition of employment, Sellman was required to have an FAA flight certificate. Further, it is unlawful to exercise airman privileges if not medically cleared (App. 155; Supp. App. Vol. I 60-61, 80, 144; UMF 4).

Sellman first learned that his FAA medical certificate may not be renewed after receiving a letter dated November 29, 2017, stating that the FAA was unable to establish his eligibility to hold an airman certificate (Supp. App. Vol. I 77; Vol. III 1-3; UMF 25). Thus, as of November 29, 2017, Sellman knew he must work on becoming medically eligible (Supp. App. Vol. I 82; UMF 25). Sellman did not give a copy of the November 29, 2017 FAA letter to Sofge (Supp. App. Vol. I 81; UMF 25).

Sellman responded to the November 29, 2017 FAA letter over a month later on January 5, 2018. Sellman explained that in October 2017, he was told during his annual airman medical physical certificate that he would not be granted an FAA certificate while on Zoloft, a selective serotonin reuptake inhibitor. Sellman stopped taking Zoloft on October 30, 2017 and reported being in a good mood without any side effects and feeling better than while on Zoloft (Supp. App. Vol. I 82-83; Vol. III 4; UMF 26).

8

On January 5, 2018, Williams emailed Sellman that they needed to properly document his medical matters, that ATC wanted to protect his HIPAA rights, and would keep his medical information confidential (App. 169; UMF 27).

Sofge emailed Sellman the next day on January 6, 2018 asking Sellman if he had contacted HR about his FAA flight status, whether he received any written clarification back from HR, and told him that his door was always open (App. 208; UMF 29). Two days later, Williams emailed Sellman asking if he had scheduled his Human Intervention Motivation Study Aviation Medical Examiner appointment yet to get his medical certificate (App. 171-172; UMF 29).

On January 10, 2018, Dr. Vincenza Tiberia, wrote a medical note after examining Sellman on January 8, 2018 stating that it was her opinion that Sellman was not experiencing adverse effects from discontinuing Zoloft, which Sellman agreed with (Supp. App. Vol. I 89; Vol. III 5; UMF 31).

The FAA sent Sellman another letter on January 19, 2018 stating it was still unable to establish his eligibility to hold a medical certificate, requesting more information, and that it was his responsibility to provide the required information to determine eligibility for a medical certificate (Supp. App. Vol. III 6-11; UMF 32). Later, Williams emailed Sellman on January 30, 2018 advising him that the FAA would not release any information to Williams and that Sellman had to "do

the leg work" to get the issue resolved before his current medical ran out (App. 173; Supp. App. Vol. I 95-96; UMF 33).

Sellman responded to the FAA's January 19, 2018 email on January 31, 2018. Sellman provided Dr. Tiberia's note and further stated that he has never received any treatment records, was never treated for depression, the VA never saw or treated him for restless sleep, and that he was in a stable mood (Supp. App. Vol. I 96-97; UMF 34).

Once again, on February 13, 2018, the FAA wrote Sellman notifying him that it could not grant a medical certificate and requested additional information. Sellman did not give the letter to anybody and only told Williams the FAA wanted more information (Supp. App. Vol. I 98; Vol. III 12-13; UMF 35). Sellman responded to the FAA on February 21, 2018, stating that his wife has said his restless sleep improved, he has had no testing or treatment of restless sleep since May of 2015, has remained in a stable mood without Zoloft, and his Post Traumatic Stress Disordered ("PTSD") and restless sleep are controlled without medication.  Sellman's restless sleep had gotten better and Sellman had not told the VA that his restless sleep had improved. Further, Sellman never showed this letter to anyone at ATC (Supp. App. Vol. I 99-100; Vol. III 14; UMF 36).

Williams again reached out to Sellman on February 23, 2018 asking if he received his FAA flight certificate. Williams further stated his belief that, as of

February 23, 2018, the evaluation ATC had on file expired. While there was some confusion as to the timing, Sellman's FAA certificate did, in fact, ultimately expire and he was not medically cleared to fly (App. 179; Supp. App. Vol. I 114-15; UMF 38).

Williams, Stephens, Young, Sofge, and Cox have not had any previous flight crew employees have a medical certificate expire (Supp. App. Vol. I 145-46, 151-52, 156, 179-180, 185; UMF 39, 41). Similarly, Sellman has no knowledge of any other employees that had "up" or "down" issues[3] and he admitted Williams making sure Sellman was medically cleared to fly was not retaliatory (Supp. App. Vol. I 92-94; UMF 42). Young, Stephens, and Cox knew Sellman's FAA medical certificate had expired but did not have any knowledge of the specific reasons why or of any of Sellman's specific alleged disabilities (Supp. App. Vol. I 147, 151, 166; UMF 41). Indeed, Sellman never discussed the specifics of his alleged disabilities with anyone at ATC except a co-worker, Kraig Kerkenides, and never requested an accommodation (App. 163; Supp. App. Vol. I 58-59, 68-70, 76, 81, 98, 101, 113; UMF 40).

## 6. The Decision to Not Renew Sellman's Contract.

Sellman argues that Sofge's recommendation not to renew Sellman's contract is the impetus behind his cat's paw theory. Yet he admits that Sofge did

---

[3] In his deposition Sellman argued that he believed he was retaliated against because he was pulled off a flight while ATC believed he was "down" or unable to medically fly. He has not raised that as an issue here and it is therefore abandoned.

not have the authority to hire, renew contracts, or terminate employees (Supp. App. Vol. I. 74, 146, 150, 154, 174-175, 183; UMF 47). Rather, it was Stephens and Young who made the decision to not renew Sellman's contract after on-going discussions and with final approval from Cox (Supp. App. Vol. I 146, 150, 154, 174-175; UMF 48).

More still, there is no evidence that any of the decisionmakers considered or relied upon Sofge's off-hand recommendation. In fact, Sellman admits he has no personal knowledge or information regarding Cox's, Stephens's, and Young's views on his continued employment at ATC (Supp. App. Vol. I. 73-74; UMF 50). He has never even spoken with Cox or Stephens (Supp. App. Vol. I 65-66; UMF 51). And Cox did not have any knowledge of Sellman's complaint to HR when he gave final approval to not renew Sellman's contract (Supp. App. Vol. I 146-147; UMF 53).

Fatal to Sellman's arguments is he admits the very reasons Young, Stephens, and Cox decided not to renew his contract. Specifically, Young and Stephens admittedly made the business decision to not renew Sellman's contract because of his subpar performance, as communicated by Mueller and based off of Young's own views of Sellman's performance while Young was working in Kuwait. Young and Stephens did not have any specific knowledge of the performance review process being rolled out by Sofge. Young and Stephens considered the high

expectations of ATC and decided it would be better for ATC to let Sellman finish the remainder of his contract and then hire a better performing employee (App. 180-185; Supp. App. Vol. I 150-152, 154-156; UMF 52).

As for Cox, he admittedly gave final approval to not renew Sellman's contract. Cox was aware that Mueller communicated Sellman had marginal performance issues, but did not see Sellman's Performance Evaluation or have any knowledge of the specific process. Cox was aware that Young believed Mueller's view of Sellman's performance was consistent with what Young observed in Kuwait. Further, Cox had general knowledge that Sellman's FAA medical certificate had expired, but did not know of the specific reasons. Cox considered Sellman's failure to meet an essential function of the job (maintaining a medical certificate) to further indicate Sellman's performance issues with communication, initiative, and dependability. Cox admittedly made the business decision to not renew Sellman's contract because, based on Sellman's subpar performance, it would be better for ATC to let Sellman finish the remainder of his contract and then hire a better performing employee (Supp. App. Vol. I 151-152; UMF 53).

## III.   <u>SUMMARY OF THE ARGUMENT</u>

The District Court properly granted summary judgment on Sellman's ADA and USSERA claims. Nothing that Sellman argues on appeal warrants reversal. At best, he relies on conjecture and speculation to create an alleged fact question. But

his appeal is fatally flawed by the fact that he did not dispute any of ATC's UMFs–in fact, he expressly admitted them all.

Sellman cannot show any causation or pretext. Specifically, there is no applicable cat's paw theory here that raises any genuine issue of material fact for several reasons. First, there was not sufficient temporal proximity between Sellman's complaint to HR in November 2017 and the decision to not renew his contract in March 2018. Moreover, this Court has routinely held that temporal proximity is insufficient to establish pretext.

Second, Sellman does not provide any evidence that Young, Stephens, or Cox considered or in any way relied upon Sofge's recommendation that Sellman's contract not be renewed. Sofge's recommendation was a passing comment in an email expressly related to Sellman's subpar performance. Sellman admitted that Sofge had no authority to not renew his contract. At most, the recommendation was mere input, which is not enough to apply the cat's paw theory. Under Sellman's flawed view of this case, any recommendation or input by an alleged bad actor would be enough to avoid summary judgment.

Third, and more fatal to Sellman's alleged cat's paw theory, is that he admits all the reasons Young, Stephens, and Cox decided to not renew Sellman's contract. Those admitted reasons include Young's own views of Sellman's subpar performance, Mueller's repeated views of Sellman's subpar performance, and

Cox's own view that Sellman's failure to meet the essential function of his job to renew his FAA flight certificate was further evidence that Sellman had issues with communication, initiative, and dependability. In short, there was not uncritical reliance—or evidence of any reliance—on Sofge's recommendation.

Fourth, Plaintiff only has immaterial speculation of whether Mueller knew of the November Incident. Mueller testified that he was not aware of the November Incident until well after he did Sellman's performance review. Sellman only has unsupported insufficient speculation that Mueller knew of the incident because of where Mueller's office was located near the area of the November Incident and that Mueller allegedly "joked around" with Sellman less after the November Incident. Such speculation does not create a genuine issue of material fact.

Regardless, the November Incident itself is not protected conduct and the dispute or mere knowledge of it cannot show pretext. Sellman admits he never spoke to Mueller regarding his complaint to HR, there is no evidence any other person spoke to Mueller about it, and Mueller testified he only learned of the complaint after Mueller's own termination from employment. As Sellman admitted, there would be nothing to retaliate against if Mueller did not know about his complaint.

Fifth, the District Court correctly found there was no disturbing procedural irregularity with Sellman not signing his performance review. Furthermore,

Mueller emailed his performance review with additional comments regarding his view of Sellman's marginal performance, including that Mueller ranked Sellman last of the loadmaster instructors and his performance was at the bottom of the entire aircrew. Sellman ignores Mueller's emailed comments. Cox, Stephens, and Young were surely abled to analyze Sellman's marginal performance based on Mueller's other comments outside of the performance review process.

Nonetheless, the annual review process was new and not established in Kuwait, the decisionmakers did not know what policy Mueller or Sofge were following regarding the performance appraisal when they made the decision, and there is no evidence that Mueller treated Sellman differently than any other similarly situated employees in application of the review process.

The District Court assumed that Plaintiff was disabled for purposes of the ADA. The Court here could affirm judgment on the ADA discrimination claim on the independent grounds that Plaintiff has not provided sufficient evidence that his impairments substantially limit one or more major life activity. PTSD is certainly an "impairment" and affects too many veterans. But Plaintiff must do more than claim he has a VA rating and name conditions to make an ADA claim. All of the evidence shows that he was telling the FAA he was not disabled, and he offers no evidence to support that how his alleged disabilities substantially limited his life while employed at ATC.

Finally, the District Court correctly found that Sellman's USERRA claims fails as a matter of law. The plain language of the statute and vast weight of authority holds that USERRA does not apply to alleged disability or retaliation claims regarding a VA disability rating, even if injuries were suffered during military service. Even if USERRA did apply here, there is no evidence of discrimination or retaliation based on Sellman's military status. In addition to why there is no evidence of discrimination or retaliation for the ADA claim, Sellman's position essentially required military experience and ATC knew he was a veteran. More still, ATC is a DAV owned company, has won awards for hiring DAVs, and nearly every ATC employee involved in this case—Mueller, Sofge, Stephens, Young, and Cox—are also all DAVs. Nothing gives rise to an inference that Sellman's veteran status had anything to do with the decision to not renew his contract.

The District Court properly granted summary judgment for numerous reasons. ATC requests that the Court affirm the District Court.

## IV.  <u>STANDARD OF REVIEW</u>

The Tenth Circuit reviews the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citation omitted). The Tenth Circuit "may affirm the district court's grant of summary judgment on any ground

adequately supported by the record." *Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1184 (10th Cir. 2011), citing *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1215 (10th Cir. 2010). Notably, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart,* 144 F.3d 664, 670 (10th Cir. 1998) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To avoid summary judgment, Sellman must do far "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, he "must present sufficient evidence in specific, factual form for a jury to return a verdict in [their] favor." *Bacchus Indus. Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991). In ruling on summary judgment, the Court should grant reasonable inferences in favor of the non-moving party, but the Court does not have to make "unreasonable inferences in favor of the non-moving party," *Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1187 (10th Cir. 2013) (internal quotations omitted) or "adopt one party's version of the facts if the record doesn't support it." *Harte v. Comm'r*, 864 F.3d 1154, 1173 (10th Cir. 2017). An inference is unreasonable if it requires "'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. V. Alerus Fin., N.A*., 858 F.3d 1324, 1334 (10th Cir. 2017) (citation omitted). The nonmoving party "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor." *Id.* (citations omitted).

Under this standard, Sellman did not and could not meet his burden, and the District Court properly disposed of all his claims on summary judgment.

## V. <u>ARGUMENTS AND AUTHORITIES</u>

### 1. Plaintiff's ADA Discrimination and Retaliation Claims Fail.

Where, like here, there is no evidence of direct evidence, courts use the *McDonnell Douglas* burden shifting framework to assess ADA retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). Sellman must first establish a prima facie case of discrimination or retaliation. *Id.*

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) he engaged in protected activity; (2) he was subject to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Id.* Courts have applied the "but-for" causation standard to ADA retaliation cases. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570 (5th Cir. 2020) (applying "but for" causation to ADA retaliation claim); *Nyanjom v. Hawker Beechcraft Corp.*, No. 12-1461-JAR, 2015 WL 3397934, at *19 (D. Kan. May 26, 2015), *aff'd*, 641 F. App'x 795 (10th Cir. 2016). "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise." *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018).

ADA discrimination claims are governed by the same burden-shifting framework of *McDonnell Douglas*. To establish a prima facie case of disability discrimination, Sellman must show: (1) he is disabled as defined by the Americans with Disabilities Act Amendments Act ("ADAAA"); (2) he is qualified to perform the essential functions of his position with or without a reasonable accommodation;

and (3) he was discriminated against *because of* his disability. *McKenzie-Nevolas v. Deaconess Holdings LLC*, No. CIV-12-570-D, 2014 WL 518086, at *1 (W.D. Okla. Feb. 7, 2014), *appeal dismissed* (May 28, 2014). If Sellman fails to establish a prima facie case, the inquiry ends there; however, if he is successful, Sellman then bears the ultimate burden of demonstrating that ATC's legitimate reason for separating his employment is actually pretext for discrimination based on his disability. *Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1170 (10th Cir.2006). Sellman must present factual evidence to show that there is a genuine dispute of material fact showing that ATC's decision is pretext. *See Anderson*, 181 F.3d 1178.

On appeal, Sellman focuses his arguments on a cat's paw theory based on Sofge's passing recommendation to not renew Sellman's contract. "To survive summary judgment when asserting the cat's-paw theory of liability, a plaintiff must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory [or retaliatory] animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Singh v. Cordle*, 936 f.3d 1022, 1038 (10th Cir. 2019). Here, Sellman cannot show that Sofge acted motivated by animus or that it was the proximate cause of Sellman's non-renewal.

The District Court assumed, without deciding, that Sellman satisfied his prima facie burden. This Court may likewise affirm because Sellman has not shown any pretext, a cat's paw theory, or may affirm on the independent grounds that Sellman has also not shown a prima facie case. This Court may affirm the District Court's grant of summary judgment on any basis the record supports, even one the District Court did not rely upon. *Davis v. Simon Prop. Grp.*, 9 F.App'x 876 (10th Cir. 2001). In other words, the arguments below can show that Sellman failed to both establish a causal connection or pretext. The Court may affirm either way.

### A.    Sellman Cannot Show a Causal Connection Between His Alleged Protected Activity in November 2017 and the Decision to Not Renew His Contract in March 2018.

For purposes of summary judgment, ATC does not dispute Sellman's complaint to HR in November 2017 was protected activity under the ADA and the decision not to renew his contract in March 2018 was an adverse employment action.[4] On appeal, Sellman argues that the District Court did not appropriately apply the cat's paw theory because it was approximately two and a half months from Stephens counseling Sofge in mid-December 2017 and Sofge making a recommendation in an email on February 27, 2018. This argument fails to establish a causal connection.

---

[4] For clarity, ATC did not "terminate" or "fire" Sellman. It allowed him to serve the short remainder his contract year and merely decided not to renew it.

Sellman is changing the goal posts on the timing of the decision. This change is crafted to create a time span of less than three months to show protected activity in hopes of showing causation. *See Anderson*, 181 F.3d at 1179 (noting time span of three months (i.e. 12 weeks) was insufficient to show causation, one and one-half months was sufficient, and assuming without deciding, that approximately nine weeks was sufficient for causation, but did not establish pretext).

In his deposition Sellman stated he believed there was evidence of discrimination or retaliation because of the time between his complaint in November 2017 and decision not to renew in March 2018 (Supp. App. Vol. I. 75). But he now argues that the temporal proximity was between Stephens counseling Sofge about the November Incident in mid-December 2017 and Sofge's recommendation to not renew Sellman's contract in late February 27, 2018. Sofge's recommendation was not an adverse employment action and is not the appropriate marker to measure the temporal proximity. Sellman has cited no authority that temporal proximity can be measured from a mere recommendation by a non-decisionmaker. The District Court properly found that the temporal proximity from Sellman's mid-November 2017 complaint to this non-renewal in March 2018 did not show pretext (App. 27-28). Indeed, the only case Sellman still cites to make his argument, *Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir.

2001), is the same one the District Court properly distinguished below, as *Evans* involved a time span of only five days (App. 28).

### B. Sellman Cannot Show a Causal Connection Because He has Nothing More than Speculation that Mueller Knew of the November Incident or His HR Complaint.

There is also no causation because Sellman has no evidence that Mueller knew of Sellman's complaint to HR. Courts repeatedly hold that there is no causal connection when there is no evidence that decisionmakers knew of the protected conduct, or relied upon information from those without knowledge of the protected conduct. *See Laul v. Los Alamos Nat'l Lab'ys*, 765 F. App'x 434, 442 (10th Cir. 2019); *Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1287–88 (10th Cir. 2018) (explaining non-moving party cannot speculate knowledge by mere discussion of normal business); *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("An employer's action against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."); *Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*, No. CIV-15-936-R, 2017 WL 5618613, at *3 (W.D. Okla. Nov. 20, 2017) (citing cases). Sellman even admits that if Mueller did not know about his complaint to HR then there would be no retaliation (Supp. App. Vol. I 93).

Sellman's arguments for why Mueller allegedly knew are not persuasive and based on pure conjecture. He argues that Mueller knew because his office was near where the conversation of the November Incident happened (*see* Appellant Br. at 7). Yet, there is no evidence Mueller was in his office and Mueller testified he normally worked with headphones on, he did not know about the November Incident until after doing his performance review, and there is no evidence anyone—including Sellman—ever spoke to Mueller about the November Incident (App. 36-37; Supp. App. Vol. I 75; Vol. II 145-146). Sellman's own notes of the incident reflect Mueller was not there (App. 186). Sellman must have more than pure speculation. *See, e.g., Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014).

Sellman also argues Mueller knew because he was more serious around Sellman than other people. He provides no corroboration beyond his own subjective views. Even if true, this Court has stated that, "[a]n inference of discrimination or retaliation cannot be drawn based merely on an unfriendly work environment." *Kenfield v. Colorado Dep't of Pub. Health & Env't*, 557 F. App'x 728, 734 (10th Cir. 2014). Further, this Court and other courts have repeatedly held that the ADA is not a "general civility code" and normal "tribulations of the workplace" are not actionable. *See Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1265 (10th Cir.1998); *McDaniel v. Piedmont Indep. Sch. Dist. No. 22*, No. CIV-11-373-M, 2012 WL 1227154, at *5 (W.D. Okla. Apr. 11, 2012).

More still, the conversation in the November Incident was not protected conduct in itself. Sellman does not establish that Mueller knew anything about Sellman's alleged disabilities. There is no evidence that Mueller himself made any discriminatory comments or actions against Sellman. Sellman also provides no argument or evidence that Mueller knew of Sellman's complaint to HR, which would be protected conduct. He has nothing beyond pure speculation that Mueller knew.

**2. Sellman Cannot Show Pretext Based on a Cat's Paw Theory.**

Even if the Court were to assume Sellman can make a prima facie case, he has no evidence of pretext, particularly under a cat's paw theory.

The legitimate, non-discriminatory and non-retaliatory reason that Young, Stephens, and Cox decided to not renew Sellman's contract was his marginal performance (*See* UMF 49-54). Sellman was ranked last of the entire aircrew by Mueller, Young personally observed him under performing while Young worked in Kuwait, and Sellman's failure to timely renew his required FAA medical certification was further evidence to Cox that Sellman had issues with initiative, communication, and dependability (*Id.*). The decisionmakers simply had high standards that Sellman knew about yet he did not meet, and ATC made the good faith business decision to hire a better performing employee. Sellman now asks this Court to improperly second guess ATC's business judgment, of which this Court

repeatedly holds it will not do. *See, e.g., Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000).

There is no evidence that this legitimate, non-discriminatory, non-retaliatory reason is pretext. There is nothing to show that the decisionmakers acted as a "dupe" of Sofge or that Young, Stephens, and Cox even considered his recommendation. Furthermore, the undisputed material facts show they did not act as a "rubber stamp" with "uncritical reliance" of Sofge's recommendation, even assuming it was considered at all. Sellman's claim thus fails under this Court's well-established case law. *See Thompson v. Little am. Hotel Co.*, No. 22-4006, 2022 WL 10832885, at *6 (10th Cir. Oct. 19, 2022) ("[P]laintiffs cannot rely on the cat's paw theory of liability when an unbiased third party independently reviews an employee's performance and makes the decision to terminate her employment."); *Singh*, 936 F.3d at 1038–39 (discussing breaks in causal chain by employer); *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294–96 (10th Cir. 2013) (same). Sellman cannot show pretext for several reasons, as discussed below.

**A. Sellman Has Nothing but Speculation that Mueller Knew of Sellman's Protected Conduct and Mere Knowledge is Insufficient to Establish Pretext.**

As noted above, there is no evidence that Mueller knew anything about the November Incident or Sellman's HR complaint when Mueller filled out the

performance evaluation and emailed his other comments to Sofge. This goes to the heart of Sellman's cat's paw argument. His weak speculation and subjective view that Mueller knew because he allegedly joked around less is insufficient to establish any knowledge. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) ("In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*," and "do not look to the plaintiff's subjective evaluation of the situation."). There is certainly no discrimination, no retaliation, and no cat's paw with the decisionmakers relying on Mueller's belief of Sellman as a marginal employee.

Sellman has provided no evidence that Mueller acted with any discriminatory or retaliatory animus, even if he knew of the November Incident or the HR complaint. Sellman never spoke to Mueller about the incident, never spoke to Mueller about his alleged disabilities, and there is no evidence Mueller ever made any comments or action showing any discriminatory or retaliatory animus (*See* UMF 12-14, 40).

Not only is there a lack of any evidence, but there is no reason to assume such, either. Mueller himself is a DAV and is currently a Lieutenant Colonel in the Marine Reserves whose job is to help Marines find civil employment and transition to civilian life (App. 220-221). Mueller's and the decisionmakers status as DAVs only underscore that there is no discriminatory or retaliatory animus. *See Palzer v.*

*Coxcom, LLC*, 2019 WL 11585348 *11 (N.D.Okla.) ("The fact that critical employees in the discharge decision were members of the same protected class belies any suggestion of pretext.") (citing *Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1241 (10th Cir. 2014)).

Even if Sellman was able to establish some knowledge of the November Incident or his HR complaint by Mueller's or others, mere knowledge of an HR complaint or disability status is, as the District Court properly found, insufficient to show discrimination or retaliation. *See Anderson v. AOL, LLC*, 363 F. App'x 581, 586-87 (10th Cir. 2010); *see also Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir. 1998) ("Mere knowledge of a disability cannot be sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate only in cases where the employer is completely unaware of the plaintiff's disability."); *See Laul v. Los Alamos Nat'l Lab'ys*, No. 1:17-CV-0741-WJ-KBM, 2020 WL 365024, at *12 (D.N.M. Jan. 22, 2020) (explaining mere knowledge makes little sense in showing retaliation).

Further, Mueller only passed on his own view of Sellman's performance. Mueller himself made no recommendations of any employment action. Thus, Sellman cannot establish a cat's paw theory when there is no evidence that Mueller

himself intended to cause any adverse employment action. *See Singh*, 936 F.3d at 1038.

**B. Cox, Stephens, and Young Did Not Act as a "Rubber Stamp" of Any Recommendation.**

The District Court correctly noted that Sellman did not dispute that Stephens and Young made the decision to not renew Sellman's contract, with final approval by Cox. Sellman admitted that Sofge had no authority to make the decision not to renew his contract and provides no evidence that the actual decisionmakers gave any deference or consideration to Sofge's unauthorized recommendation. In fact, he even admits that he has no personal knowledge of what the decisionmakers' views were on his continued employment (UMF 50). Moreover, it is undisputed that the actual decision was based, in part, on Mueller's view that Sellman was a marginal employee and performed at the bottom of the air crew (UMF 49, 52-53). Further, it is Young's opinion from his own observations was that Sellman was a marginal performer and that Cox and Stephens also considered Young's view (UMF 24, 52). It is also undisputed that Cox believed Sellman's failure to timely renew his FAA flight certificate was indicative of Sellman's performance issues with communication, initiative, and dependability (UMF 53). The District Court found that, "Plaintiff's failure to dispute any of these material facts is fatal to his theory that Defendant's decision-makers merely 'rubberstamped' Sofge's

recommendation." (App. 26). On appeal, Sellman ignores these admitted facts that are fatal to his cat's paw theory.

### C.  Sellman's Performance Appraisal Does Not Establish any Pretext or a Cat's Paw Theory.

Sellman argues he can show pretext because he did not sign his performance, denies he saw the appraisal, Mueller did not follow ATC's performance appraisal policy, and that his appraisal was too subjective. His argument fails for several reasons.

First, Mueller shared his views of Sellman's marginal performance outside of the performance appraisal (UMF 19). Young, Stephens, and Cox believed Mueller's view was consistent with Young's own experience working with Plaintiff (UMF 19, 52-53). Sellman completely ignores that his marginal performance was brought up in Mueller's emailed comments even outside of the appraisal process. It is a ludicrous position that the decisionmakers could not rely on all of Mueller's comments, especially when he admits the very reasons Stephens, Young, and Cox decided not to renew his contract.

This is especially true when it is admitted that the performance appraisal process was recently started by Sofge and the decisionmakers did not have any knowledge of the specific performance appraisal process Mueller used. Sellman's theory of the case that the decisionmakers were locked into analyzing Sellman's performance solely on an allegedly improper evaluation process is not supportable.

*See Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209–10 (10th Cir. 1997) ("[Employee] responds that [employer's] proffered reason is pretextual because she did not receive any 'documented counseling' regarding her poor performance pursuant to the handbook. The mere fact that each incident of deficient work was not 'documented' does not address the inherent performance issues. [Employee] failed to show that [employer's] proffered reason for her dismissal was one which a rational jury could find 'unworthy of credence.'").

Second, Sellman has not shown there was an "established" policy. *See Wright v. City of Topeka, Kan.*, 547 F. App'x 861, 863 (10th Cir. 2013). He admits that the policy had only recently been rolled out when Sofge became the Director of Operations, that Young did not do performance appraisals, and the decisionmakers did not know what specific policy was being used (UMF 15, 23, 52-53).

Third, he has no evidence that this policy was not actually followed. Mueller specifically testified that he did not "recall the specific policy guidance" when asked about having Sellman's signature on the appraisal (App 47).

Sellman's or others own subjective views of how the ATC Performance Appraisal Policy works is also not supported by the actual document terms. The ATC Performance Appraisal Policy specifically states that the rater (e.g. Mueller as Sellman's supervisor), is responsible for giving performance ratings (App. 189-

191). But the policy only specifically says that the rater must discuss the employee's job description and performance objectives with the employee, which happened (*Id.* (compare § 1.3 to § 1.4); UMF 16). In other words, nothing requires the rater to discuss actual performance with the employee. The policy also does not limit ATC from making employment decisions on any other basis. In fact, both the policy and the ATC Employee Handbook indicate that the purpose of the performance evaluation is to determine pay levels: nothing limits or suggest that it is the sole basis for renewal decisions (*Id.* (stating policy purpose is for management to make pay determinations)); (App. 192-193 (stating compensation is adjusted for employee performance and policy shows relationship of performance and pay)).

Fourth, Sellman cannot show Mueller treated him differently than any other similarly situated employees. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (quotations omitted) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."); *see also Payan v. United Parcel Serv.*, 792 F. App'x 634, 646 (10th Cir. 2019). Specifically, Mueller did not do evaluations for other loadmasters. Rather, it is admitted, that Sofge did the evaluations for the other loadmasters because Mueller's own contract had not been renewed and the timing of the other employee's contracts (Supp. App. Vol. III 15-

33

20; UMF 22). Sellman has no comparators that he was (or would be) treated differently by Mueller than any other employee. In all, this is far different than in *Metz v. Merrill Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482, 1492 n. 12 (10th Cir. 1994), which Sellman cites as an example of a company not following a policy. In that case, there was significant trial testimony of how the policy at issue was not followed with other similarly situated employees and, unlike here, there were inconsistent reasons for termination by the decisionmakers. *Id.*[5]

Fifth, Sellman's arguments that another employee, Jean Colley, testified Sellman was competent and that the review was too subjective both fall flat. As the District Court noted, Colley's view of Sellman's performance was not inconsistent with Mueller's; they both determined he was technically competent (App. 30).[6] Regardless, it is the facts as they appear to the decisionmakers (Cox, Young, and Stephens) that is relevant, not how they appear to non-supervisory co-workers. *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."); *Young v. Cobe Lab'ys, Inc.*, 141 F.3d 1187 (10th Cir. 1998) (holding co-workers' views of plaintiff's performance did

---

[5] Sellman may argue Sofge gave inconsistent reasons because Sofge said he did not know about Sellman's nonrenewal. But it is true that Sofge did not know of the decision until after it was actually made. Sofge may have given a recommendation, but Sellman admits that Sofge was not, in fact, the decisionmaker and there is no evidence that Sofge was included in the actual decision, made by individuals in Oklahoma.

[6] Colley also testified that he did not observe any objective differences in how Sofge treated Sellman after the November Incident (Supp. App. Vol. I 243).

not create fact question). Sellman overstates his argument that the use of any subjective criteria in evaluating performance establishes pretext.

Most performance evaluations have a subjective element. The performance evaluation here is not unlike that in *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1200 (10th Cir. 2008), where this Court had no issues with the evaluations that gave rankings on independent criteria, such as behavior dimensions like "act with integrity, build relationships, and demonstrate leadership." *Id.* at n.8. The evaluation here is much like that in *Hinds* where it likewise ranks employees on specific criteria (e.g. "communication skills" and "dependability") and is also coupled with Mueller's email comments to Sofge regarding Plaintiff's negative performance (UMF 17-19).

Moreover, Sellman has no evidence to connect Mueller's alleged failure to follow the policy to Sofge's alleged discriminatory or retaliatory animus. There is no evidence of Mueller displaying any animus. For a cat's paw theory to apply, Sellman would be required to have some evidence that Mueller knew he was not following the policy, that Sofge ordered or convinced Mueller to not follow the policy, that Sofge ordered or convinced Mueller to create a bogus evaluation, that Mueller did not subjectively believe Sellman actually had the substantive performance issues he noted, and that Sofge and Mueller intended the performance evaluation to lead the actual decisionmakers to not renew Sellman's contract.

Sellman offers zero evidence to any of that. Making those unsupported leaps is painting Sofge as a conniving puppet master based all on pure conjecture and beyond any applicable cat's paw theory.

In the end, the District Court correctly ruled that none of Plaintiff's arguments show, as required, a "disturbing procedural irregularity" (App. 28-29). Even assuming that the policy was to have Sellman sign the form, Mueller's failure to have a signature is insufficient to show pretext (*Id.* (citing *Doke v. PPG Industries, Inc.*, 118 F. App'x 366, 370 (10th Cir. 2004) (finding failure to follow company policy of providing written warnings insufficient to establish pretext); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that … the substantive reasons given by the employer for its employment decision were pretextual.") (citation omitted); *Velasquez v. Frontier Medical Inc.*, 375 F.Supp.2d 1253, 1287 ("Resolving all doubts in favor of [the plaintiff], and concluding that the mandatory policy was to have the employee sign all reprimands … there is still insufficient evidence to create a genuine issue of material fact that [the defendant's] reason is pretext.")).

**3.     Sellman Cannot Establish a Discrimination Claim for The Independent Reasons That He Is Not Disabled and There Is No Evidence of Disability Discrimination Pretext.**

There are independent reasons to grant summary judgment on Sellman's discrimination claim. These include that the decisionmakers were in the same protected class as DAVs, Sofge's alleged comments were, at best, stray remarks months before the decision to not renew the contract, and that Sellman has not provided evidence that he is disabled for purposes of the ADA.

> ### A.    ATC is DAV Owned, All Decisionmakers and Mueller were DAVS, and Sofge's Alleged Comments were Stray Remarks.

Sellman never discussed his alleged disabilities with anyone at ATC except a co-worker not relevant here (UMF 40). Rather, he bases his whole case on the fact that was discriminated against based on getting a 100% VA Disability Rating and that he is a DAV. This is unreasonable. Mueller is a DAV, currently in the Marine Reserves and helps Marines transition to civilian life as they overcome struggles, such as PTSD. ATC is a DAV owned company that has won awards for its efforts in hiring DAVs (UMF 6). All the decisionmakers are DAVs. In other words, they are all in the same class that Sellman specifically complains about. Courts have recognized that when decisionmakers are of the same protected class, plaintiffs face a "difficult burden" of establishing discrimination and weigh against showing pretext. *See Almon v. Goodyear Tire & Rubber Co.*, No. 07-4104-SAC, 2009 WL 1421199, at *7 (D. Kan. May 20, 2009) (collecting cases); *Vasilescu v. Black & Veatch Pritchard, Inc.*, 155 F. Supp. 2d 1285, 1293 (D. Kan. 2001). Sellman falls far short of this difficult burden.

Sellman's case also hinges on one conversation in November 2017 where Sofge made allegedly discriminatory or offensive comments related to Sellman's 100% VA rating. The sole alleged inappropriate comment was made by non-decisionmaker, Sofge (UMF 10, 40, 48). Sellman admits that after November Incident, Sofge never made any other inappropriate comments (UMF 10).[7] Even if Sofge's November 2017 comment implicated Plaintiff's alleged disability, it was months before the non-renewal in March 2018 and is, at best, a "stray remark," which does not show discriminatory animus. *See, e.g., McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998); *Angell-Boyd v. Universal Cable Holdings, Inc.*, No. CIV-07-0724-HE, 2008 WL 11337968, at *4 (W.D. Okla. Oct. 1, 2008).

In short, there is no reasonable discriminatory animus of the decisionmakers and the sole inappropriate comment by Sofge, a non-decisionmaker, made months before the non-renewal does not show pretext.

## B. Sellman Did Not Provided Sufficient Evidence That He Is Disabled Under the ADA.

The District Court assumed, without deciding, that Sellman was disabled as defined by the ADA and thus made a prima facie case. This Court can affirm on

---

[7] Sellman argues that Sofge allegedly ignored him and refused to speak with him after the November Incident. However, he admits Sofge voluntarily invited him to his personal Christmas party and Sellman's views are not corroborated by any witness (*see* Supp. App. Vol. I 121-22). As noted above, Colley did not notice any objective different in the working relationship. The decisionmakers were also in Oklahoma when the November Incident occurred and all times afterwards.

the same basis. However, the Court may also affirm judgment on the basis that Sellman has not provided any evidence that his impairment substantially limited one or more life activity while employed or that he was regarded as disabled.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). To show he is disabled under 12102(1)(A), Sellman "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Russell v. Phillips 66 Co.*, 687 F. App'x 748, 752–53 (10th Cir. 2017); *also* 29 C.F.R. § 1630.2 (j)(1)(ii).

ATC does not dispute that Sellman has a VA disability rating or that PTSD or depression are recognized impairments. Rather, Sellman's claim fails because (1) courts have routinely held that a VA disability rating is distinct from being disabled under the ADA and (2) he has not shown sufficient evidence that his alleged impairments substantially limit one or more major life activity.

Courts have repeatedly held that an individual's VA disability rating does not establish they are disabled or has a record of impairment for purposes of the ADA. *See Spencer v. U.S. Postal Serv.*, No. 08-CV-02249-KLM-MEH, 2009 WL 5217981, at *6 (D. Colo. Dec. 29, 2009), aff'd, 388 F. App'x 785 (10th Cir. 2010)

(collecting cases); *Smith v. Wilkie*, No. 3:17-CV-1333-J-JRK, 2019 WL 4737604, at *15 (M.D. Fla. Sept. 27, 2019); *Rowe v. Shulkin*, No. 17-CV-9258, 2019 WL 2060951, at *9 (N.D. Ill. May 9, 2019). This is, in part, because VA ratings do not address severity as the ADA does and is for a different purpose with a different standard. *See id.*; *see also* Supp. App. Vol. I 116-17 (discussing VA disability purpose).

Here, Sellman has made it clear that he does not distinguish between his disability rating and alleged disability (Supp. App. Vol. I 67, 84). Moreover, Sellman never discussed any specifics of an alleged disability (*See* UMF 40-41). In short, his whole case is based on his VA disability rating, not any specific disability. Plainly, Sofge, Cox, Stephens, and Young cannot discriminate against a "disability" if they do not know what it is and are, at best, only aware of Sellman having a VA disability rating. *See Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cty., Okla.*, 232 F. App'x 765, 771–72 (10th Cir. 2007) ("[I]t does not follow that a reasonable inference of discrimination may be drawn from mere awareness of a disability. . . .").

The Tenth Circuit has made it clear that a plaintiff must come forward showing that an impairment substantially limits a major life activity. *See Tesone v. Empire Mktg. Strategies*, 844 F. App'x 64, 67 (10th Cir. 2021); *Russell*, 687 687 at

748, 755–56. Sellman identified his disability as PTSD (Supp. App. Vol. I 56).[8] But Sellman's own testimony does not support how it substantially affects a major life activity while at ATC. Indeed, he never sought treatment for PTSD, does not take anything, and all of his statements to the FAA and the medical note he secured to get his FAA certificate indicate that he did not, in fact, have any substantially limiting issues and was cleared to fly (UMF 26, 31, 34, 36). Sellman has simply failed to provide sufficient evidence that his PTSD substantially limits any major life activity, while employed at ATC. *See Alsbrook v. Int'l Paper Co.*, No. 2:19-CV-673-TFM-MU, 2021 WL 4482143, at *8 (S.D. Ala. Sept. 29, 2021) (granting summary judgment, in part, because, like here, the plaintiff stated PTSD did not affect his performance at work).

Sellman cites several cases to argue a 100% VA disability rating is evidence to show he was disabled or regarded as disabled. None of those cases involved a VA disability rating. At most, they involved Social Security disability and reflect the proposition that receiving social security disability income is *not* dispositive of being disabled under the ADA. *See, e.g., Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 926 (7th Cir. 2001) ("The Supreme Court has held that evidence of the receipt

---

[8] Plaintiff identified other items he has a rating for or sought rating for. As discussed, those are separate from what disabilities he may have under the ADA. He stated PTSD, neuropathy that started after his employment with ATC, and "ratings for neck and hand" were "pretty much it for his disabilities" (Supp. App. Vol. I 56). To the extent he claims that "neck and hand ratings" is an ADA disability, his only evidence is that it sometimes causes tension headaches and he takes Tylenol or Motrin (*Id.*). Sometimes getting a headache and taking Tylenol is a fact of life and not substantially limiting any major life activity.

of SSDI benefits regarding a claimed disability should not be a dispositive factor in ADA disability determinations.") (internal citations omitted). Those cases, unlike here, also involved evidence beyond the fact of an impairment that showed how the plaintiffs were specifically disabled or had a life activity that was substantially limited. *See, e.g., Moore v. Wal-Mart Stores E., L.P.*, No. CIV. A. 707CV193 HL, 2009 WL 3109823, at *8 (M.D. Ga. Sept. 23, 2009) ("Evidence of impairment, however, without additional evidence showing that the plaintiff is substantially limited in her ability to work is insufficient to meet the ADA's definition of disabled. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195…(2002), *superseded by statute on other grounds,* ADA Amendments Act of 2008….("[Defendant] has presented evidence showing that [Plaintiff's] impairment moderately limits her from working and does not substantially limit [Plaintiff] from working in a broad range of jobs. [Plaintiff] admitted that she could not do 'a whole lot of bending and stooping and stuff like that and lifting things heavy'... [Plaintiff] has presented sufficient other evidence showing she is substantially limited in the activity of working.").

Finally, Sellman cannot show he was "regarded as" disabled. The only alleged inappropriate comments about his VA rating were by Sofge. But Sofge was allegedly making the opposite point: Sellman's VA rating was not necessary because he was *not* disabled. Indeed, Sellman testified that Sofge was allegedly

42

sarcastic (Supp. App. Vol. I 136-137). There is insufficient evidence he was "regarded as" disabled, disabled as defined by the ADA, or had a record of disability.

> **4.    USEERA Does not Include Claims of Discrimination or Retaliation Based on a VA Disability Rating and there is No Evidence that Sellman's Status as a Veteran had Any Role in his Non-renewal.**

USERRA's plain language, statutory structure, and vast weight of jurisprudence show that allegations of discrimination or retaliation based on a 100% VA disability does not make a USEERA claim. Beyond references to USERRA's general policy, Sellman provides no factual or legal analysis of his claim that USERRA applies to his allegations of discrimination and retaliation based off of his 100% VA disability rating. Even if he did make a USERRA claim, there is no evidence or a causal connection or pretext. Sellman ignores that his military experience was largely required for the job, that ATC is DAV owned, and that Cox, Stephens, Young, Sofge, and Mueller are all DAVs. The District Court properly found that Sellman did not make a USERRA claim as a matter of law and, if he did, there is still insufficient evidence to avoid summary judgment.

### A. Sellman Did Not make a USERRA Claim as a Matter of Law Based on the Plain Language, Statutory Structure, and Weight of Authority.

USERRA's antidiscrimination provisions state a person "who is a member of, applies to be a member of, performs, has performed, applies to perform, or has

an obligation to perform service in a uniformed service shall not be denied…retention in employment…on the basis of that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C. § 4311(a). Nothing in the plain language of this does it reference disability status or VA disability ratings. More still, USERRA defines "service in the uniformed services," which focuses solely on the voluntary, involuntary, character, and timing of duty. *See* 38 U.S.C. § 4303(13). Again, nothing in the definition's plain language refers to disability or VA rating that could be read into the antidiscrimination provisions.

The statutory structure of USERRA further supports that service incurred disability or VA ratings are not implicated in the USERRA antidiscrimination provision. Congress chose to explicitly include specific provisions related to disabilities incurred in service in the *reemployment* provision of USERRA. *See* 38 U.S.C. § 4313(3). In other words, Congress was not unaware of service incurred disabilities and chose not to include any mention of them in the discrimination provisions. *See Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1270 (10th Cir. 2004) (analyzing statutory scheme to conclude that Congress's silence in one area of a statute indicates Congress's intent not to allow particular remedies). Thus, the statutory scheme supports that Sellman has not stated a cause of action under

USERRA for alleged disability or discrimination solely related to comments regarding his VA disability rating.

Finally, Sellman cites no case in support of position that USERRA's antidiscrimination protections cover even service related disability. Conversely, the vast weight of authority concludes that USERRA's protections of military service are distinct from alleged disability that may result from service. *See, e.g., Cazares v. City of El Centro*, No. 320CV01571BENRBM, 2021 WL 807680, at *8 (S.D. Cal. Mar. 3, 2021) ("USERRA does not authorize cases for discrimination due to a real or perceived service-connected disability."); *Ferrell v. Ezpawn Oklahoma, Inc.*, No. CIV-18-607-SLP, 2019 WL 3207797, at *3 (W.D. Okla. July 16, 2019) ("[Plaintiff] alleges that he was discriminated against due to the disability he suffered during his military service...Such alleged discrimination is not within the scope of USERRA's protection."); *Wolfgram v. G4S Secure Sols. (USA), Inc.*, No. 1:18CV198, 2018 WL 5016337, at *3 (N.D. Ind. Oct. 15, 2018) ("[Plaintiff] alleges that [employer] discriminated against him due to his disability, which he acquired during his service in the armed forces. However, the fact that [plaintiff's] alleged disability began during his military service does not in itself implicate USERRA absent additional facts….USERRA was passed for the purpose of protecting active duty service members who are required to miss time from their civilian employment to fulfill their military obligations."); *Carroll v. Delaware*

*River Port Auth.*, 89 F. Supp. 3d 628, 633, 634 (D.N.J. 2015) (stating "a USERRA plaintiff has the initial burden of demonstrating that his military *service,* as distinct from a *disability* resulting from service, was a substantial or motivating factor in the employer's decision" and collecting decisions from the federal Merit System Protection Board holding the same).

These decisions stretch even to USERRA's statutory predecessor, the Veteran's Reemployment Rights Act ("VRRA").[9] *See, e.g., Leistiko v. Sec'y of Army*, 922 F. Supp. 66, 76 (N.D. Ohio 1996), *aff'd sub nom. Leistiko v. Stone*, 134 F.3d 817 (6th Cir. 1998) (holding VRRA did not apply to plaintiff's service incurred physical impairment). Congress is presumed to know the judicial interpretation of the VRRA when it passed and incorporated it into USERRA. *See Lorillard v. Pons*, 434 U.S. 575, 580, (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"). The fact that Congress did not add any disability related language in the antidiscrimination provision of USERRA only solidifies what the plain language shows: Sellman has no cause of action under USERRA for his allegations based solely on disability or his VA rating.

---

[9] The VRRA was consolidated into USERRA when USERRA was passed. *See* 38 U.S.C. §§ 4301 *et seq.,* effective October 13, 1994.

**B.    Even if Sellman Properly Made a USERRA Claim, There Is No Evidence that His Military Service was a Motivating Factor in his Non-renewal.**

This Court need not even determine whether USERRA applies as a matter of law. It may hold, as the District Court did, that even if there was a USERRA claim Sellman has not shown any evidence that shows there was a discriminatory or retaliatory motive based on Sellman's military service. This is because of all the same reasons why Sellman cannot show causation or pretext for his ADA claim. In addition, it is undisputed that ATC knew Sellman was a veteran when it hired him and that his status was preferred, if not required, for the job (*see* App. 187-188). There is no evidence of any disparate treatment for any non-military employees. Indeed, the opposite is true, Mueller, Sofge, Stephens, Young, and Cox are all veterans[10] and, DAVs at that. ATC has even been recognized for its efforts in hiring veterans and DAVs by the U.S. Department of Labor and the Disabled American Veterans, Department of Oklahoma (Supp. App. Vol. I 146, 157-158; UMF 6.). No reasonable jury could conclude that Sellman was discriminated or retaliated against based on his military service in violation of USERRA.

---

[10] Cox graduated from the United State Air Force and served 17 years in the Air Force; Stephens retired as a Lt. Colonel after 20 years of service in the United States Marine Corps and two years of service in the United States Army; Young retired as a Colonel after 30 years of service in the United States Marine Corps; Sofge is a DAV and served in the Marines.

## VI.    <u>REQUEST FOR RELIEF</u>

ATC respectfully requests affirmation of the District Court's order granting it summary judgment and all other relief to which ATC may be entitled.

## VII.    <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Fed. R. App. P. 34(a)(1), ATC does not request oral argument. ATC does not believe there are unique circumstances in this case that warrant oral argument. Sellman expressly does not dispute any of ATC's material facts and does not provide any other factual information which raises any issue worthy of oral argument. While the Tenth Circuit has not held whether USERRA applies to discrimination or retaliation allegations solely related to disability related service or VA disability ratings, the plain language, Congressional intent, and jurisprudence show that it does not and oral argument would not provide any additional clarity. And, even if there was a serious legal question, the undisputed facts show that Sellman's military service was not a motivating factor in the nonrenewal of his contract.

/s/ *Philip R. Bruce*
Philip R. Bruce
McAfee & Taft
A Professional Corporation
Eighth Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone (405) 552-2390
**Attorney for Appellee**

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certified that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.      Exclusive of the exempted portions in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contained 11,246 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft® Word 2019 in Times New Roman typeface, 14-point font for text and 14-point font for footnotes.

## **CERTIFICATION OF DIGITAL SUBMISSION**

I hereby certify that a copy of the foregoing, as submitted in digital form via the Court's ECF system, has been scanned for viruses with Windows Defender Antivirus, Security Intelligence Version 1.399.1183.0, and, according to the program, is free of viruses. I hereby certify that the digital form is an exact copy of the written document filed with the Clerk of this Court. I hereby certify that all required privacy redactions have been made per 10th Cir. R. 25.5.

## **CERTIFICATE OF SERVICE**

I hereby certify on March 4, 2024, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of Court will transmit a notice of Electronic Filing to all ECF registrants on file for this case.

*s/ Philip R. Bruce*
Philip R. Bruce